Filed 3/26/14  In re Christopher C. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re CHRISTOPHER C. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGECY, | D064692 |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1041A-C) |
| v. | |
| ELIZABETH C. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant Francisco O.

Michele Anne Cella, under appointment by the Court of Appeal, for Defendant and Appellant Elizabeth C.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Erica R. Cortez, Deputy County Counsel, for Plaintiff and Respondent.

Terence M. Chuca, under appointment by the Court of Appeal, for Minors.

Elizabeth C. and Francisco O. appeal the juvenile court's denial of their respective petitions under Welfare and Institutions Code[1] section 388, each of which sought to modify the juvenile court's earlier order terminating reunification services with respect to three of their minor children. They also appeal the subsequent judgment terminating their parental rights and selecting adoption by the paternal aunt as the permanent plan. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *The Petitions and Detention*

In October 2011, the San Diego County Health and Human Services Agency (the Agency) filed petitions in the juvenile court under section 300, subdivision (b), after Elizabeth left her and Francisco's three children—Christopher (then eight years old), Angelina (then four), and Isabella (then two)—with Elizabeth's mother, who refused to evacuate the children when police discovered a high reading of natural gas in the family home.

The Agency's detention report summarized the events preceding the filing of the petitions. A former occupant of the apartment returned to retrieve certain belongings and

---

1      All statutory references are to the Welfare and Institutions Code.

broke a window to gain entry. A neighbor called the police, who noticed a strong odor of gas when they arrived. Despite the children's exposure to gas—two of the children exhibited elevated levels of carbon monoxide—the grandmother was uncooperative and combative, pushing and shoving paramedics, and refusing to allow the children to receive medical attention. Police arrested the grandmother for resisting or delaying an officer. Police also found methamphetamine on the kitchen floor and marijuana and drug paraphernalia in the bedroom where the children were watching television.

At the time of the incident, the grandmother reported Elizabeth's whereabouts were unknown and Elizabeth did not have a cell phone; Francisco was incarcerated. Elizabeth later told the Agency she and the children had not had any contact with Francisco in a long time. Christopher reported he could not remember the last time he saw Francisco. He also reported he had told his grandmother he smelled gas, but she told him to go back to his room.

In a follow-up interview, Elizabeth denied she or anyone else in the family home used drugs. Yet, Christopher reported he had seen his aunt Priscilla's drug paraphernalia—two glass pipes, which Christopher drew pictures of—in the home. Elizabeth also claimed not to know that drugs were found in the family home on the day of the incident. Elizabeth agreed to drug test, but failed to appear. Two days later, she refused to meet with a substance abuse specialist.

At the detention hearing in October 2011, the court ordered out-of-home detention for the children and allowed Elizabeth to have supervised visits.

3

*B.*     *Jurisdiction/Disposition*

The Agency's jurisdiction report dated December 6, 2011, indicated the children remained in out-of-home care with a paternal aunt, Christina B. Further investigation revealed Elizabeth admitted during a prior child welfare investigation that she had used methamphetamine during her pregnancy with Christopher, who was delivered prematurely at 33 weeks. During the current investigation, however, Elizabeth denied any drug use as an adult. Elizabeth tested negative for drug use in November 2011.

Elizabeth insisted the incident that led to the children's removal was an accident and that "the agency is making it up." She denied that her mother refused medical treatment for the children, and continued to make excuses for her mother's alleged lack of awareness of the gas leak.

The jurisdiction report indicated both parents have criminal histories. Elizabeth had convictions for theft and burglary, and had been unemployed for the past two years. Francisco's criminal history dated back to 1989 and included convictions for grand theft, burglary, possession of a controlled substance, and obstructing/resisting a public officer. At the time of the jurisdiction/disposition hearing, Francisco was incarcerated, serving a two-year sentence for commercial burglary. He admitted to using crystal meth on various occasions and reported he last used three and a half years ago.

Elizabeth reported she and Francisco were never married and were no longer in a relationship. She stated Francisco had not been consistent in the children's lives—at

4

times he would visit about twice a week, then would disappear for months or come around all the time. Elizabeth did not know what to expect from Francisco.

The Agency's addendum report dated January 9, 2012, informed the court that Elizabeth and her relatives were evicted from the maternal grandmother's home because the homeowner complained of drug activity, too many people living in the home, and extensive damage to the premises. Later, Elizabeth attended an Agency meeting and was behaving strangely enough to prompt the Agency to ask her to submit to a drug test. Instead of going to the test facility, Elizabeth had Christina drop her off at a liquor store. A few weeks later, a substance abuse specialist at the courthouse reported that Elizabeth smelled of alcohol. Elizabeth denied she had consumed alcohol that day. A social worker asked Elizabeth to submit to a drug test and offered her a ride to the testing site. Elizabeth declined transportation and said she would get there on her own. Elizabeth never showed up.

On February 3, 2012, the juvenile court found jurisdiction under section 300, subdivision (b), declared the children dependents, and placed them in relative care. The parents were advised that due to the age of the children, the court could limit their reunification services to a period of six months.

C.     *Six-Month Review*

The Agency's July 2012 six-month review report noted the parents had not been in contact with the Agency in over two months. As of their last contact, both parents were unemployed, transient, and were residing with friends. Both parents tested negative for

5

drugs in February and April 2012 and completed a parenting class in May. Neither parent, however, enrolled in individual therapy or participated in a substance abuse treatment program. The parents visited the children in Christina's home approximately once per week for one to two hours.

Francisco failed to comply with the terms of his probation. He failed to check in weekly with his probation officer (as required due to Francisco's transient status) and tested positive for methamphetamine in February 2012. As a result, the Agency added substance abuse treatment to Francisco's case plan.

At the six-month review hearing on July 23, 2012, the court found that reasonable services had been offered to the parents, but that they had not made substantive progress with the provisions of their case plans. The court determined a return of the children to their parents presented a substantial risk of detriment to the children, and ordered them to remain in the custody of their relative caregiver and ordered that the parents receive six more months of reunification services.

D.     *12-Month Review*

The Agency's January 22, 2013, 12-month status review report noted both parents had been incarcerated for criminal activity during the reporting period. Elizabeth was involved in seven incidents of theft over an l5-month period and was arrested three times. She failed to attend the only on-demand drug test the Agency requested during the review period. In December 2012, Elizabeth tested positive for methamphetamine and amphetamine during drug tests administered in connection with her probation. Despite

the positive drug test, Elizabeth continued to deny that she used any drugs. She was still not enrolled in therapy and had refused multiple referrals to drug treatment programs.

Francisco was arrested in August 2012 because he violated the terms of his probation by testing positive for methamphetamine.

In September 2012, Francisco began therapy and enrolled in a three-month residential substance abuse treatment program at Volunteers of America Sobriety House (VOA). While at VOA, Francisco would leave treatment to be with Elizabeth despite being told not to do so by program staff and his probation officer. In addition, he was very defensive and argumentative when it came to addressing his violations or behaviors. He acknowledged that going to the same places and being around the same people as when he used drugs presented a risk of relapse, but he denied knowing Elizabeth used drugs. According to his probation officer, Francisco had been testing clean for drugs since early September 2012, but was "barely" in compliance with the terms of his probation. Francisco was scheduled to complete the VOA program in December 2012, but voluntarily stayed longer because he was on the waiting list to attend another residential program called South Bay Pioneers. Francisco entered South Bay Pioneers in January 2013. Francisco reported he had been sober in the past, but his longest period of sobriety was two to three years.

In November or December 2012, police responded to a verbal dispute between Elizabeth and Francisco at a hotel. The parents provided differing accounts of the

incident. It does not appear from the record that either parent was arrested or charged with any crime as a result of this incident.

The parents continued to have supervised visitation with the children. During visits, the parents and children would watch television, play in the backyard, or play video games. The parents did not routinely call the children in between visits or to check up on them; at most, the parents called once per month.

The Agency's addendum reports dated March 7 and March 13, 2013, stated Elizabeth was incarcerated from January 11 to March 2, 2013, and was released from custody on the condition that she enter into Kiva, a six- to nine-month residential drug and alcohol treatment program for substance abusing women and their children. Elizabeth confirmed she was pregnant and, according to her probation officer, admitted she used drugs four to five times during the pregnancy despite knowing or suspecting she was pregnant. Francisco was aware Elizabeth had used drugs twice during her current pregnancy, but continued to have frequent contact with her despite her recurring drug use.

The Agency further reported Francisco obtained employment as a car salesman in February 2013. As a result of his work schedule, Francisco stopped visiting the children every week and began visiting every other weekend. Francisco did not give his sister any money while she cared for his children, but he did put money on Elizabeth's book while she was incarcerated.

At the 12-month review hearing on March 13, 2013, the juvenile court found return of the children to parental custody would be detrimental and the services provided had been reasonable. The court also found Elizabeth had not made substantive progress with the provision of her case plan. Although the court found Francisco had made substantive progress with his case plan, the court nonetheless concluded there was no substantial probability of the children's return by the 18-month milestone. Consequently, the court terminated reunification services and scheduled a hearing under section 366.26 to select and implement a permanent placement plan.

The court granted Francisco short, unsupervised visits with up to two children at a time, provided (1) he remained sober; (2) the visits took place in a public setting; (3) he cleared the location with the social worker 24 hours in advance; and (4) Elizabeth not be present.

E.     *The Agency's Section 366.26 Report and Addendum*

Social worker Kathleen Forbes prepared the section 366.26 assessment report dated July 9, 2013. She opined the children were adoptable, but recommended legal guardianship because Christina was not willing to adopt at that time and Forbes believed it was in the children's best interests to remain with their aunt. The children had lived with Christina for 19 months and were thriving in her care. As a sibling group, there were 20 families (three in San Diego County, 17 out-of-county) with approved home studies willing to adopt a sibling set with the children's characteristics. As individual children, there were 25 adoptive families interested in a child like Christopher, 76

9

families interested in a child like Angelina, and 99 families interested in a child like Isabella.

Forbes reported Christopher had a limited understanding of adoption versus guardianship, but indicated his first choice was to live with his parents and his second choice was to live with his aunt Christina. He preferred guardianship, but did not know why. Angelina and Isabella did not understand the difference between the permanent plans, but reported that if they could not live with their parents they wanted to live with their aunt.

Forbes further reported Francisco continued to visit the children at his sister's house, but did not avail himself of the opportunity to have unsupervised visits. During the visits, Francisco played with the children and was appropriate; however, the children would seek out Christina in the other room to attend to their basic needs. While Elizabeth was at Kiva, she used her weekend passes to have supervised visits with the children at Christina's house. Overall, Forbes remarked Elizabeth did not regularly visit the children during the reporting period due, in part, to her incarceration, her desire that visits not be supervised by the Agency, and a delay in contacting the Agency once she left Kiva.

In an addendum report dated July 9, 2013, the Agency changed its recommended permanent plan from legal guardianship to adoption. The change was prompted by a call Christina made to Forbes to convey that Christina was now willing to adopt the three children if the court found adoption was the most appropriate plan. Christina had thought

10

long and hard about the decision and wanted to ensure that the children had stability and continued to thrive as they had in her home. Christina had spoken to the children about her willingness to adopt, and the children reported being comfortable with that choice, though they expressed a desire to maintain contact with their parents. After Christina's phone call to Forbes, the Agency held a meeting with Christina and the parents to discuss Christina's willingness to adopt. The meeting was emotional, and despite the parents' opposition, Christina reiterated that although she preferred guardianship she remained willing to adopt. Christina explained that her decision was based partly on her observations of Francisco's pattern of stability followed by bouts of instability and crisis.

The parents set the matter for trial.

## F.     *The Sections 388 and 366.26 Hearings*

A few days before the contested section 366.26 hearing, each parent filed a section 388 petition seeking to modify the juvenile court's March 13, 2013, order terminating reunification services by returning the children to the parents' care and reinstating services. The court found the parents made a prima facie showing, and set the hearing on their petitions to coincide with the contested section 366.26 hearing.

The contested hearing took place over several days in September 2013. The court advised the parties that evidence admitted during the section 388 portion of the hearing would also be considered during the section 366.26 phase. From the Agency, the court received in evidence the Agency's 12-month status review report and addenda, the section 366.26 assessment report and addendum, and social worker Forbes's curriculum vitae.

11

The court also received in evidence each parent's section 388 petition and attachments.[2] The court heard live testimony from Francisco, Christina, Elizabeth, and Forbes, and received stipulated testimony from Christopher.

### 1. Francisco's Testimony

Francisco testified he had used drugs since he was 15 years old. After he completed the 90-day VOA program, he continued treatment with South Bay Pioneers— partly to obtain additional treatment, but also because he "didn't have a place to stay, first of all." At the time of the contested hearing, he had been clean 372 days. He was on the fourth step of a 12-step program and was working with a sponsor. Francisco was aware that his "triggers" included being in places and with people he associated with drug use. He testified his plan to keep his children safe was to stay clean, focus on his recovery, work, and build a bond with his family. Francisco had been working fulltime since February 2013 and had recently secured an apartment that he shared with Elizabeth. This was the first time during his current sobriety that he had lived outside of a structured environment.

---

[2] Francisco's attachments included a treatment update from his therapist, a letter from his employer, a 12-step meeting attendance record, and a verification of enrollment letter from South Bay Pioneers treatment program. Elizabeth's attachments included a letter from Kiva indicating she completed a three-month treatment program; a report from an outpatient treatment center indicating Elizabeth was enrolled in the program for approximately three weeks and had provided two negative drug tests; an attendance record for 12-step meetings between March and May 2013; and certificates of completion for a parenting class and an HIV/AIDS, hepatitis, and tuberculoses class.

Francisco repeatedly denied Elizabeth had used drugs in the past, despite her documented history. He claimed she only began using drugs after the "little fiasco" that led to the children being taken into protective custody. Francisco explained Elizabeth's drug use "wasn't serious" because he did not see "her use drugs on a daily thing . . . ." He did not think Elizabeth would relapse or that if she did it would affect his sobriety.

Francisco testified he continued therapy at his own expense after reunification services were terminated. After about a year of therapy, he had achieved his treatment goals and completed therapy. He admitted he never spoke to his therapist about Elizabeth's drug use.

Francisco continued visiting the children at Christina's house every other weekend. He also visited on about 10 weeknights since he was released from incarceration in January 2012. He explained he did not take advantage of the opportunity to have unsupervised visits because he did not want to take just two of the children at a time and leave the third behind. During visits with the children, they would eat, watch movies, draw pictures, dance, and have tea parties. Francisco helped Christopher with a book report once. Francisco testified he was respectful of Christina's daily routine of caring for the children.

### 2. *Christina's Testimony*

Christina testified she had been caring for her brother's children for almost two years. She said Francisco visited the children in her home every other weekend and he played games with the children and occasionally helped Christopher with his homework.

13

Throughout the year, Christina recalled approximately four or five times that Francisco visited the children during the week. She testified the children were happy to see Francisco and enjoyed their visits with him. But he did not help her with the children's daily routine such as cooking for them or bathing them. Christina testified she had seen some positive changes in Francisco, but acknowledged that he had a history of using drugs and going to jail and she had seen him through many tumultuous times in his life.

Christina said the children rarely asked about Elizabeth.

Christina testified she knew the difference between guardianship and adoption and confirmed that at the end of June she called Forbes and told her she was willing to adopt the children. Christina explained she did not want to see the children regress from all the progress they had made with her or be adopted by anyone else. No one at the Agency ever told Christina it was possible the children would be removed from her care, but she heard from other people who had been involved in similar cases that it was a possibility. Although she preferred guardianship to keep open the possibility that Francisco could someday regain custody of the children, she was nonetheless willing to adopt. Under either permanent plan, it was Christina's intention to continue to allow the children to have contact with the parents.

### 3. Elizabeth's Testimony

Elizabeth testified she completed the Kiva drug treatment program in June 2013 and was currently enrolled in aftercare. She was currently working the second step of a 12-step program, but could not accurately recite the step and was not working with a

14

sponsor.  She claimed she did not know of Francisco's substance abuse history until he was placed on probation for drug-related charges.  Elizabeth testified that as part of her recovery she was supposed to avoid addicts.  She considered Francisco an addict, but felt it was appropriate to remain in a relationship with him because they never used drugs together.

Elizabeth admitted she knew that her sister who lived in the family home at the time the children were removed smoked marijuana in the past and owned drug paraphernalia, yet continued to deny knowledge of anyone in her home using drugs at the time the children were removed.  She also admitted she was trying to get pregnant—and suspected she might be—at the time she used methamphetamine earlier that year.

Elizabeth testified she was the children's primary caregiver before they were removed.  Before she was incarcerated in January 2013, Elizabeth visited the children twice each week for two hours at Christina's house.  She did not have any visits with the children while she was incarcerated, but spoke with them about once each week.  Once she was released from custody and was residing at Kiva, Elizabeth visited the children at Christina's house once each week.  After Elizabeth graduated from Kiva, her visitation schedule changed to weekly, one-hour visits that were supervised by Forbes at a visitation center.  During visits, Elizabeth and the children would draw, play games, and do homework.  Elizabeth said she gave the children snacks and tended to their needs, such as disciplining them and taking them to the bathroom.  She also said the children

were sad when their visits ended. Elizabeth brought Frankie to two of her visits with the children.[3] The children seemed interested in him.

Elizabeth admitted that during the dependency she did not provide financial support for the children or speak to any of their teachers or doctors—she "left that all up to Christina."

### 4. Social Worker Forbes's Testimony

Kathleen Forbes testified she was assigned as the social worker on the case in April 2013. Regarding the parents' section 388 petitions, Forbes did not think the parents had progressed sufficiently to have the children returned or that it was likely the children would be returned with continued services. As for Francisco, Forbes observed he had only been clean outside a structured environment for a short time and needed to prove continued sobriety. Having the children returned would be a huge stressor for him. Moreover, Forbes faulted Francisco for failing to have a specific plan as to how to stay sober while maintaining a relationship with Elizabeth, particularly in light of the argument at the hotel that led to the police being called.

Forbes testified Elizabeth's circumstances had not significantly changed, but were still in the process of changing. Forbes acknowledged Elizabeth recently completed three months in Kiva and was participating in an aftercare program, but Elizabeth frequently minimized her use of drugs. Forbes was also concerned because Elizabeth stated she was

---

3    After Frankie was born in August 2013, a social worker inspected the home Elizabeth shares with Francisco and decided not to open up a case on Frankie.

16

working step two of the 12-step program but did not even know step one correctly. Forbes was also concerned that Elizabeth had not shown any new coping or parenting skills.

Forbes opined the fact that both parents testified that living together would not affect their respective sobriety was evidence they lacked insight and solidified her assessment that the children were not ready to be returned to them. She expressed concern that if one of the parents relapsed it would adversely affect the other.

Forbes testified that if the children were returned to the parents, they would be without Christina, which would have an emotional impact on them. Forbes also asserted that the potential for relapse by the parents and an ensuing removal would be devastating to the children. She was concerned with the parents' long-standing pattern of drug use followed by incarceration, as well as their current lack of insight into their drug problems.

Forbes said she spoke with Christopher in April 2013 and he told her his first choice was to live with his parents and that he preferred guardianship over adoption. When she spoke with him again in July and asked about adoption, he shrugged and said it would be the same as guardianship, but confirmed that he still wanted to see his parents if he is adopted. Angelina and Isabella also said they wanted to live with their parents. Forbes explained that, based on her training and experience, most children who are removed from an abusive or neglectful home want to return to their parents even if it is not the best place for them to live. She opined this is because children learn in school

17

and social settings about parental roles and children want to have a part of that connection with their biological parents.

Regarding a permanent plan, Forbes favored adoption because the children had thrived from the care and stability they received from Christina. In addition, Forbes was concerned as to whether the parents would be able to maintain the positive changes they had made over time. While the children enjoyed visits with their parents and looked forward to them, Forbes characterized the parents' roles as "friendly visitors."

Forbes acknowledged the children would always have a bond with their parents; however, she believed the benefits of permanency outweighed the benefits to maintaining that relationship. She opined a permanent plan of legal guardianship would not provide the same stability as adoption because there would always be the question of whether the children were going back to their parents.

### 5. *Christopher's Stipulated Testimony*

Christopher testified via stipulated testimony that he wanted to continue living with Christina, but wanted the option of someday returning to his parents' care.

### G. *The Juvenile Court's Ruling*

After hearing argument from counsel, the court denied both parents' section 388 petitions. The court found neither parent showed a true change in circumstances since the March 2013 order terminating services. The court also found it would not be in the best interests of the children to be returned to their parents.

Regarding permanent placement, the court found the children generally and specifically adoptable, rejected all of the exceptions to adoption advanced by the parents, terminated parental rights, and ordered the children placed for adoption.

The parents timely appealed.

DISCUSSION

I.

*SECTION 388 PETITIONS*

Both parents contend the juvenile court abused its discretion by denying their respective section 388 petitions. We disagree.

A.      *General Legal Principles*

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child. [Citation.]" (*In re A.A.* (2012) 203 Cal.App.4th 597, 611 (*A.A.*).) "The parent bears the burden to show both a legitimate change of circumstances and that undoing the prior order would be in the best interest of the child." (*Id*. at 611-612.) "Generally, the petitioner must show by a preponderance of the evidence that the child's welfare requires the modification sought." (*Id*. at p. 612)

"It is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child. [Citation.]" (*In re Kimberly F.* (1997) 56 Cal.App.4th 519,

19

529 (*Kimberly F.*).)  The fact that the parent "makes relatively last-minute (albeit genuine) changes" does not automatically tip the scale in the parent's favor.  (*Id.* at p. 530.)  Instead, courts should examine at least the following factors:  "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been."  (*Id.* at p. 532.)  "While the bond to the caretaker cannot be dispositive . . . , our Supreme Court made it very clear in [*In re Jasmon O.* (1994) 8 Cal.4th 398, 408] that the disruption of an existing psychological bond between dependent children and their *caretakers* is an extremely important factor bearing on any section 388 motion."  (*Kimberly F.*, *supra*, at p. 532.)

A petition under section 388 "is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion."  (*A.A.*, *supra*, 203 Cal.App.4th at p. 612.)  An abuse of discretion occurs when the juvenile court exceeds the bounds of reason by making an arbitrary, capricious, or patently absurd determination.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

B.      *Elizabeth's Petition*

        *1.      Changed Circumstances*

Elizabeth contends she established changed circumstances because she had been sober since December 2012, completed the Kiva drug treatment program, enrolled in

aftercare and attended 12-step meetings between March and July 2013, completed a parenting class, continued visiting the children, and cared for newborn Frankie without Agency intervention.  The juvenile court did not abuse its discretion in concluding these did not constitute sufficiently changed circumstances.

The juvenile court rejected these arguments for several reasons.  The court found Elizabeth had a lengthy history of substance abuse, but only a relatively brief period of sobriety.  Her period of sobriety outside of a structured environment was even briefer.  Moreover, the court was not persuaded Elizabeth was "completely and fully engaged" in her efforts to maintain her sobriety, citing as examples her lack of familiarity with the beginning steps of her 12-step recovery program and her lack of a sponsor.  The court also found Elizabeth had been resistant to many of the therapy and drug treatment services she had been offered.

Regarding both parents, the court expressed "significant concern" regarding the "stunning lack of awareness on each of [the parents] individually of the other person's needs with respect to sobriety."  On that point, the court found "unbelievabl[e]" each parent's professed "unawareness of the other one's drug use history and problems, during a significant point of time when they were, as they claim, coparenting and involved in a relationship."

The juvenile court's conclusions and concerns are supported by substantial evidence and do not "exceed the bounds of reason."  (*In re Stephanie M.*, *supra*, 7 Cal.4th

21

at pp. 318-319.) We therefore conclude the court did not abuse its discretion in concluding Elizabeth failed to carry her burden of establishing changed circumstances.

### 2. *The Children's Best Interests*

Elizabeth contends the three-factor test articulated in *Kimberly F.* establishes the juvenile court abused its discretion in concluding that modifying its prior order was not in the children's best interests. We disagree.

Elizabeth myopically characterizes the first prong—the "the seriousness of the problem which led to the dependency" (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532)— as the parents' decision to leave "the children with an incompetent caregiver, who not only exposed them to natural gas, but also refused help from first responders." The problem was much more serious than that. Apart from continuing to attempt to shift blame to her mother,[4] Elizabeth's characterization ignores that police found marijuana, methamphetamine, and drug paraphernalia accessible to the children. Indeed, that formed one of the bases of the Agency's dependency petitions.[5] Although Elizabeth denied generally knowing there were any drugs in the apartment, she admitted knowing her sister who was living with them at the time had used drugs in the past and possessed drug paraphernalia. Indeed, Christopher was able to draw pictures of the two glass pipes

---

[4] The juvenile court also found Elizabeth was "still . . . ascribing blame to others for her circumstances, which she has greatly contributed to or was the cause" of.

[5] The Agency's petitions alleged "law enforcement personnel found methamphetamine, marijuana, and drug paraphernalia in the home accessible to the child. Thus the child is in need of the protection of the Juvenile Court."

he had seen in the apartment. The court did not abuse its discretion by finding the problem to be a serious one.

Regarding "the strength of relative bonds between the dependent children to *both* parent and caretakers" (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532), the juvenile court observed "both parents enjoy good visits with their children," the "children acknowledge their parents as parents," and "call them mom and dad." The court credited Christina, in part, for "encourag[ing] the children to continue to see their parents in the parental role." But Elizabeth never moved beyond supervised visits with the children, and during those visits the children looked to others to meet their needs. Elizabeth testified at the contested hearing that she deferred to Christina for the children's educational and medical needs, and provided no financial support for the children. By contrast, the court determined "the children have a very strong relationship with the caretaker," who "has been the person who has been the parent to these children in providing structure and meeting their needs." The court "applaud[ed]" Christina for doing "an excellent job with these three children to have them feel safe and loved." The court's determinations were supported by substantial evidence and were not an abuse of discretion.

Finally, with regard to "the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been" (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532), the court referred to its changed-circumstances analysis regarding the degree to which Elizabeth's drug abuse remained inadequately treated, both individually and in the context of maintaining a relationship with a partner whose own

23

drug abuse Elizabeth fails to appreciate. The court did not abuse its discretion in reaching this conclusion.

C.     *Francisco's Petition*

       1.     *Changed Circumstances*

Francisco contends he established changed circumstances because he had successfully completed two residential treatment programs and the goals set for him in individual therapy; he had been clean and sober for over one year, continued to attend 12-step meetings, and was working with a sponsor; he was gainfully employed; and he had consistently visited the children.

The children's counsel argued below, and the juvenile court agreed, that the changes cited by Francisco were not truly changes because, by and large, they had already occurred before the court's March 13 order terminating services that Francisco sought to modify. For example, as of the March 13 hearing, Francisco was already sober, had completed the VOA residential treatment program and was enrolled in South Bay Pioneers, was involved in individual therapy, was employed, and was regularly visiting the children.

The court also expressed "significant concern" that Francisco had not changed with respect to his lack of appreciation or insight into the extent of Elizabeth's substance abuse problems and their potential impact on his own sobriety. Indeed, the court found his testimony untruthful on that topic, which the court deemed "a very significant issue regarding the safety of the children in the parents' household." The court explained this

was "very concerning" because it was the first time Francisco and Elizabeth would be working on their sobriety together long-term. In addition, the court observed the parents had the "added stressor" of raising infant Frankie.

The court also noted Francisco's "sobriety in an unstructured environment is also maybe changing, but it's not yet a changed circumstance." In that regard, Francisco had only been sober outside of incarceration or residential drug treatment programs for about one month leading up to the contested hearing. He was also still on the same, fourth step of his 12-step recovery program as he was at the March 13 hearing.

The juvenile court's conclusions are supported by substantial evidence and do not "exceed the bounds of reason." (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.) We therefore conclude the court did not abuse its discretion in concluding Francisco failed to carry his burden of establishing changed circumstances.

### 2. *The Children's Best Interests*

With regard to the first *Kimberly F*. factor, we concluded above that the juvenile court did not abuse its discretion in finding the "the problem which led to the dependency" to be a serious one. (*Kimberly F*., *supra*, 56 Cal.App.4th at p. 532.) Francisco attempts to distance himself from that conclusion by arguing he had nothing to do with that problem because he was incarcerated at the time of removal. But he concedes his substance abuse became a factor during the course of the proceedings when he admitted to a history of drug abuse and had a positive drug test during the reunification period. That positive drug test was a violation of Francisco's terms of

probation and resulted in his arrest and incarceration. Because the children's access to drugs and drug paraphernalia was a component of the problem that led to the dependency, we cannot say the juvenile court abused its discretion in concluding the problem was a serious one as it related to Francisco.

Francisco contends the juvenile court erroneously applied the second *Kimberly F.* factor by "begin[ning] and end[ing] the analysis with the bond the children have with their aunt" and "fail[ing] to give due weight to the bond the children have with their father." Francisco concedes "[t]here is no disputing that the children have a bond with Christina, who is their aunt as well as the one who has provided for their daily needs for close to two years." But he suggests his bond was stronger because Christopher had lived 80 percent of his life with Francisco, all the children wanted to return to living with their parents, and Christina acknowledged the positive nature of Francisco's relationship with his children. We are not persuaded.

The Agency's jurisdiction/disposition report indicated Francisco had not been consistent in the children's lives and was frequently absent. Indeed, Francisco was incarcerated at the time the children were brought into protective custody. He had not seen the children in a long time and Christopher could not remember the last time he saw Francisco. During the dependency, Francisco was incarcerated again and temporarily unavailable to the children. The court also noted Francisco failed to avail himself of the opportunity to have unsupervised visits with the children.

Although the court recognized Francisco had regular and positive visits with the children leading up to the contested hearing, the court found he "had a tendency to overstate what has gone on during his time with his children." As the court explained, "I compared his testimony regarding what he does with the children versus the caregiver's, and I think father has overstated in terms of the role and what he performs for his children in terms of things, like, bringing food over to them, and working on homework." On that point, Francisco conceded in his testimony that he deferred to Christina's routine and allowed her to tend to parental tasks while he played with the children. We will not reexamine the court's credibility determinations. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947 ["We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion."].)

Regarding Francisco's argument that the children all preferred to return to their parents' care, social worker Forbes testified it was not in the children's best interests to do so, even if the children want it. We also note the children's trial counsel argued to the juvenile court that the parents had not met their burden of establishing that it was in the best interests of the children to return to their parents (or that they had established changed circumstances). Similarly, the children's appellate counsel request that we affirm the orders terminating parental rights. Substantial evidence supports the juvenile

27

court's evaluation of the comparative bonds between the children and both Francisco and Christina; the court did not abuse its discretion.

Francisco did not directly address the final *Kimberly F.* factor—"the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been" (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.) Neither will we.

## II.

### *PERMANENT PLACEMENT UNDER SECTION 366.26*

"At a section 366.26 hearing the court is charged with determining a permanent plan of care for the child." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50 (*Casey D.*).) The court may order one of three alternatives: adoption, legal guardianship, or long-term foster care. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*); § 366.26, subd. (b)(1)-(5).) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*Autumn H.*, *supra*, at p. 573.) Adoption necessarily involves termination of the biological parents' legal rights to the child. (*Id*. at p. 574.) Once the court determines by clear and convincing evidence that a child is likely to be adopted, it becomes the parent's burden to show that termination of his or her rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re C.F*. (2011) 193 Cal.App.4th 549, 553 (*C.F.*).)

The juvenile court found the children generally and specifically adoptable, rejected all of the exceptions to adoption advanced by the parents, terminated parental

28

rights, and ordered the children placed for adoption. Parents[6] contend the juvenile court erred in doing so by (1) finding the children adoptable, (2) failing to apply the "relative caregiver" exception to adoption, (3) failing to apply the "sibling bond" exception to adoption, (4) failing to apply the "parent-child beneficial relationship" exception to adoption, and (5) failing to consider the children's wishes. None of these contentions has merit.

A.    *Adoptability*

We quickly dispose of Elizabeth's challenges to adoptability because they are based on a patently untenable interpretation of the record. Elizabeth contends the juvenile court erred in concluding the children were adoptable because "Christina testified in court that she was married," and the juvenile court failed to take that potential obstacle into account. Elizabeth bases this argument on the following exchange during Christina's testimony at the contested hearing:

| | |
|---|---|
| Father's Counsel: | "And what do you do for a living?" |
| Christina: | "I work for an Orthopedic Specialist. I'm his assistant, his nurse." |
| Father's Counsel: | "What are your hours?" |
| Christina: | "8:00 to 5:00." |
| Father's Counsel: | "Five days a week?" |

---

6    Each parent adopted by reference the other's arguments raised on appeal. Thus, except as otherwise indicated, even though certain contentions were advanced by only one parent, we will discuss them as if they were asserted by both.

| | |
|---|---|
| Christina: | "Uh-huh." |
| Father's Counsel: | "Are you married?" |
| The Court: | "Is that a 'yes'?" |
| Christina: | "Yes.  I'm sorry." |
| County Counsel: | "Objection your honor.  Relevance." |
| Father's Counsel: | "Are you familiar with this at all?" |
| Court Reporter: | "Excuse me.  Hold on.  We have everybody talking at the same time, your honor." |

It is obvious from this exchange that Christina's answer, "Yes.  I'm sorry," was in direct response to the court's effort to clarify her "uh-huh" response to whether she worked five days a week, not whether she was married.  Furthermore, a moment later the court reminded Christina of the importance of responding with "yes" or "no" instead of "uh-huh" and "huh-uh."  Curiously, Elizabeth's brief omitted the critical portion of the exchange prior to the question "Are you married," which presents a misleading picture of the exchange.  Tellingly, Elizabeth's trial counsel never argued to the juvenile court that Christina was married.  Nor could such an argument legitimately have been made—the Agency's section 366.26 assessment report clearly states Christina is single and has never been married.  We conclude Elizabeth's primary challenge to the court's finding of adoptability is, at best, utterly without merit.  Because Elizabeth's remaining arguments regarding adoptability flow from the erroneous conclusion that Christina's marital status precludes her from adopting the children, we decline to address them.

*B.*        *Relative Caregiver Exception to Adoption*

An exception to the Legislature's preference for adoption applies when a "child is living with a relative who is unable or unwilling to adopt the child because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent environment through legal guardianship, and the removal of the child from the custody of his or her relative would be detrimental to the emotional well-being of the child."  (§ 366.26, subdivision (c)(1)(A).)  The parents contend this exception applies because, although Christina was *willing and able* to adopt the children, she *preferred* guardianship.  We disagree.

Many cases hold the relative caregiver exception inapplicable when a relative caregiver is willing and able to adopt but prefers guardianship.  For example, *In re Xavier G.* (2007) 157 Cal.App.4th 208, which was not cited by any of the parties, is directly on point.  There, the juvenile court terminated parental rights and referred the minors for adoption after their grandmother's stipulated testimony "would express her preference for a guardianship arrangement, but that she was willing to adopt" her grandchildren.  (*Id*. at p. 212.)  On appeal, this court concluded " 'family preference is insufficient' to trigger application" of the relative caregiver exception when a relative is willing to adopt.  (*Id*. at p. 214.)  Others are in accord.  (See, e.g., *In re Jose V*. (1996) 50 Cal.App.4th 1792, 1801 [caregiver's "testimony regarding her personal preference for guardianship over adoption was irrelevant to any inquiry at the section 366.26 hearing, where the court's task was to

select the plan which best served the child's interests. Under [relative caregiver exception], the court was required to find that she was neither unable nor unwilling to adopt Jose. In her testimony she clearly stated that she was able and willing. Any additional evidence that she preferred to be a guardian had no tendency to rebut the strong presumption that adoption was the best possible plan for Jose."]; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 810 [exception inapplicable where grandfather was willing and able to adopt but preferred guardianship]; *In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1298 [applicability of the relative caregiver exception requires the relative be unable or unwilling to adopt].)

The cases the parents cite are readily distinguishable. In *In re K.H.* (2011) 201 Cal.App.4th 406, the dependent children appealed from orders designating legal guardianship with their maternal grandmother as their permanent placement. (*Id.* at p. 409.) The juvenile court selected guardianship because the children's grandparents were *unwilling to adopt* so that they could preserve family dynamics. (*Id.* at p. 412.) The children appealed, arguing the exception did not apply because the grandparents were only unwilling to adopt because they preferred guardianship, and that such a preference was irrelevant to the analysis. (*Id.* at p. 415.) The Court of Appeal disagreed. After examining the legislative intent behind the relative caregiver exception in the context of a relative who was *unwilling to adopt* because of her preference for guardianship, the court concluded the caregiver's preference was relevant. (*Id.* at p. 418.) We find that analysis inapplicable here, however, because although Christina preferred guardianship, she—

32

unlike the grandparents in *In re K.H.*—was willing to adopt. As Christina put it, "I am open to both."[7]

Additionally, *In re Fernando M*. (2006) 138 Cal.App.4th 529 is not only unsupportive of the parents' position, it actually undermines it. That court concluded the relative caregiver exception "does not apply where the juvenile court makes a finding that [relative caregivers] are willing and able to adopt a child." (*Id*. at 535.) Because that occurred here, we need not address the other bases upon which *In re Fernando M*. is distinguishable.

Because the juvenile court found Christina was willing and able to adopt the children, the court did not err in concluding the relative caregiver exception did not apply.

## C. *Sibling Bond Exception to Adoption*

Elizabeth contends the juvenile court erred in concluding the sibling bond exception to adoption did not apply. She contends the court failed to consider the likelihood that the three children would not be adopted as a sibling set, and failed to consider the children's bond with their newborn brother Frankie. We disagree.

---

[7]    We are unpersuaded by Elizabeth's suggestion that Christina's willingness to adopt was coerced. To the contrary, the juvenile court watched Christina "very carefully" during her testimony "because the Court is always concerned about coercion . . . . The Court was very exacting in terms of what caused [Christina to become willing to adopt] to make sure that there wasn't coercion or undue influence." The court concluded Christina "clearly was not coerced by anybody . . . ."

33

The sibling bond exception arises when "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) "The sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption. It only applies when the juvenile court determines that there is a 'compelling reason' for concluding that the termination of parental rights would be 'detrimental' to the child due to 'substantial interference' with a sibling relationship." (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) "[T]he sibling relationship exception permits the trial court to consider possible detriment to the child being considered for adoption, but not a sibling of that child." (*In re Celine R.* (2003) 31 Cal.4th 45, 54.) "A sufficiency of the evidence standard of review applies to the sibling relationship exception." (*In re D.M.* (2012) 205 Cal.App.4th 283, 291.) "The appellant has the burden of showing that substantial evidence does not support the court's finding." (*Ibid.*)

To address Elizabeth's concern that her three older children would be separated, the juvenile court stated it was "only considering a plan for these children which would keep them together as a sibling set, so the Court . . . is not anticipating a situation where they are separated from each other." At the time, the children were all placed in the same

prospective adoptive home, and in the event that fell through, there were three additional

approved homes in San Diego County and 17 more outside the county who were willing

to adopt a sibling set matching the children's characteristics.[8]  Moreover, the court found

that "even in the very, very remote chance that [the] children would be separated if the

Court selected a plan of adoption," the children had all thrived so much under the long-

term, stable environment they experienced in Christina's home that the benefits of

adoption outweighed any potential interference with their sibling relationships.  Elizabeth

has failed to establish the juvenile court's findings as to the children as a sibling set are

unsupported by substantial evidence.

Nor has Elizabeth demonstrated a lack of substantial evidence supporting the

court's determination that the children's relationship with Frankie did not warrant

application of the sibling relationship exception.  To the contrary, the record establishes

Frankie was less than two months old at the time of the contested hearing, and the

children had never lived with him or shared significant common experiences.  In fact, the

children had only seen Frankie during two of Elizabeth's visits, which were one hour

each.  The court did not err in concluding the sibling relationship exception did not apply

---

8      Elizabeth argues the data on potential additional adoptive homes was stale because
"the Agency offered those statistics at the September 13, 2013 hearing from an
assessment that had not been updated since July [2013]" and that, as a result, some of
those families may have since become unwilling to adopt the sibling set.  Of course, this
argument ignores the possibility that additional potential adoptive families could have
come forward in the meantime.  In any event, we dismiss this argument as unsupported
speculation.  (E.g., *In re Jose C.* (2010) 188 Cal.App.4th 147, 159 ["We cannot interfere
with the juvenile court's ruling based on speculation about what 'may' happen."].)

35

with respect to the children's relationship with Frankie. (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 952 ["Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship."].)

D.      *Parent-Child Beneficial Relationship*

        1.      *General Legal Principles*

Another exception the parents assert here applies when the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)  In *Autumn H.*, we interpreted the beneficial relationship to mean "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)  We further explained:  "In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

The showing required to support the beneficial relationship exception is a substantial one.[9] "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) After all, "[i]nteraction between natural parent and child will always confer *some* incidental benefit to the child." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575, italics added.) Therefore, "[t]he parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent." (*C.F.*, *supra*, 193 Cal.App.4th at p. 555; *Autumn H.*, *supra*, at p. 575.) That "relationship arises from the day-to-day interaction, companionship and shared experiences." (*Autumn H.*, *supra*, at p. 575.)[10] It

_____

[9]    "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.) This led one court to remark that the beneficial relationship exception "may be the most unsuccessfully litigated issue in the history of law. . . . And it is almost always a loser." (*In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1255, fn. 5.)

[10]    We clarified in *Casey D.*, *supra*, 70 Cal.App.4th at page 51 that "[d]ay-to-day contact is not necessarily required, although it is typical in a parent-child relationship. A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction." "The benefit of continued contact between mother and children must be considered in the context of the . . . visitation mother was permitted to have." (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1537-1538 (*Brandon C.*).) But the beneficial relationship exception is "difficult to make in the situation . . . where the parents have [not] advanced beyond supervised visitation." (*Casey D.*, *supra*, at p. 51.)

37

is not enough that the parent "demonstrate 'frequent and loving contact[,]' [citation] an emotional bond with the child, or that parent and child find their visits pleasant." (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.)  "One can know a child's interests, enjoy playtime together, and be a loved relative, but not occupy a parental role in the child's life." (*In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523.)  "While friendships are important, a child needs at least one parent.  Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent." (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 854.)

Whether the beneficial relationship exception applies must be determined on a case-by-case basis.  (*Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575-576.)  We review the juvenile court's determination under the substantial evidence standard.  (*Id*. at p. 576.)

### 2.      *Application of the Exception in This Case*

The juvenile court concluded the parents maintained sufficient visitation with the children to satisfy the first prong of the exception.  We therefore address whether substantial evidence supports the juvenile court's determination that the parents failed to carry their respective burdens on the second prong—that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; *In re Cliffton B*. (2000) 81 Cal.App.4th 415, 424-425 ["[T]he juvenile court must engage in a balancing test, juxtaposing the quality of the relationship

38

and the detriment involved in terminating it against the potential benefit of an adoptive family."].) We have already discussed at length the nature of each parent's relationship with the children in connection with their section 388 petitions and the second *Kimberly F.* factor—"the strength of relative bonds between the dependent children to *both* parent and caretakers . . . . (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.) Therefore, we need only briefly summarize that evidence to conclude it constitutes substantial evidence in support of the juvenile court's determination that the beneficial relationship exception does not apply.

Elizabeth never advanced beyond supervised visits with the children, during which the children looked to others to meet their needs. Elizabeth conceded she deferred to Christina to meet the children's educational and medical needs, and Elizabeth provided no financial support for the children.

Francisco had not been consistent in the children's lives and was frequently absent; he was incarcerated when the children were taken into protective custody and again during the course of the dependency; he failed to take advantage of the opportunity to have unsupervised visits; and he deferred to Christina to tend to parental tasks while he played with the children. The juvenile court found Francisco's testimony "overstated in terms of the role and what he performs for his children . . . ."

The juvenile court's determination is also supported by social worker Forbes's testimony. Forbes had seen the children in a variety of settings and opined their relationships with the parents were those of "friendly visitor[s]" rather than parent and

child.  Forbes testified the children had thrived under Christina's care and believed the benefits of permanency outweighed the benefits to maintaining a relationship between the children and their parents.  "The trial court was entitled to find the social worker credible and to give greater weight to her assessments and testimony."  (*Casey D.*, *supra*, 70 Cal.App.4th at p. 53.)

On the record before us, we cannot say the juvenile court erred in its application of the required balancing test.

E.      *The Children's Wishes*

Elizabeth contends the juvenile court erred by failing to consider that all the children wanted to return to their parents and preferred guardianship over adoption.  We disagree.

Section 366.26, subdivision (h)(1), requires the juvenile court to "consider the wishes of the child" and to "act in the best interests of the child."  (§ 366.26, subd. (h)(1); *In re Joshua G.* (2005) 129 Cal.App.4th 189, 201.)  "[A]lthough the court is obligated to consider a child's best interests at the section 366.26 hearing, the court need not follow the child's wishes unless he or she is over the age of 12."  (*Joshua G.*, at p. 201; § 366.26, subd. (c)(1)(B)(ii).)  "[E]ven though young children . . . may want to live with [their parents], doing so may not be in their best interests and the court may nonetheless terminate parental rights."  (*Joshua G.*, at p. 201.)

The juvenile court was aware of the children's wishes and expressly stated they were taken into consideration:  "I also acknowledge in reviewing these next exceptions

40

the children's statements regarding wanting to live with their parents, which are viewed, and Christopher's statement that he prefers guardianship. And the Court certainly takes those into consideration, but of course they are not controlling—none of these children are of the age where their wishes would control the Court. I note as well that the Court always listens thoughtfully and carefully to the position of all counsel, and I did so with respect to Minor's Counsel in this case who also serves as their guardian ad litem and who distinguished in that role that adoption is in their best interest."[11] The court's determination was also supported by Forbes's testimony, which explained why adoption was appropriate, why it was superior to guardianship, and why the children's wishes may not align with their best interests. The juvenile court did not err.

## DISPOSITION

The order denying the section 388 petition and the judgment are affirmed.

_____
O'ROURKE, J.

WE CONCUR:

_____
BENKE, Acting P. J.

_____
NARES, J.

---

[11]    We note Elizabeth again quoted selectively from the reporter's transcript, ending her quotation just before the guardian ad litem opined adoption was in the children's best interests.